T.C. Summary Opinion 2006-102

UNITED STATES TAX COURT

TERRY NATHAN NORMAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24688-04S.            Filed July 10, 2006.

Terry Nathan Norman, pro se.

<u>Gavin L. Greene</u>, for respondent.

PANUTHOS, <u>Chief Special Trial Judge</u>:  This case was heard
pursuant to the provisions of section 7463 of the Internal
Revenue Code in effect at the time the petition was filed.  The
decision to be entered is not reviewable by any other court, and
this opinion should not be cited as authority.  Unless otherwise
indicated, subsequent section references are to the Internal
Revenue Code in effect for the year in issue, and all Rule
references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a $3,674 deficiency in petitioner's 2002 Federal income tax. After a concession by respondent,[1] the issues for decision are: (1) Whether petitioner was a partner in Physical Therapist Search International, Ltd. Limited Partnership (PTSI or the partnership); (2) if he was a partner in PTSI, whether petitioner must report a distributive share of PTSI's income; (3) whether petitioner is entitled to a theft loss deduction under section 165(e) relating to certain actions taken by PTSI's general partner; and (4) whether respondent is estopped from asserting a deficiency against petitioner.

Some of the facts have been stipulated, and they are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Playa Del Rey, California, when his petition was filed. For convenience, we combine our findings and discussion herein.

Burden of Proof

Pursuant to section 7491(a), the burden of proof as to factual matters shifts to respondent under certain circumstances. See also Rule 142. Petitioner has neither alleged that section 7491(a) applies nor established his compliance with the requirements of section 7491(a)(2)(A) and (B) to substantiate

---

[1] Respondent concedes that petitioner is not liable for self-employment tax of $1,194. The adjustments in respondent's notice of deficiency not addressed in this opinion are computational.

items, maintain records, and cooperate fully with respondent's reasonable requests. Petitioner therefore bears the burden of proof.

Issue 1. Whether Petitioner Was a Partner in PTSI

In 1990, petitioner entered into an agreement titled "Limited Partnership Agreement of Physical Therapist Search International, Ltd. Limited Partnership" (the agreement). The other party to the agreement was an Illinois corporation called PT Search International Ltd. (the corporation). The agreement provides that petitioner and the corporation "hereby enter into a limited partnership" for the purpose of placing physical therapists in hospitals and healthcare facilities. The agreement lists petitioner as a limited partner and the corporation as the general partner and tax matters partner.

The agreement provides that petitioner "shall make an Initial Capital Contribution in the amount of $100,000 and shall receive a four percent (4%) Participating Percentage" in PTSI. The agreement provides that the corporation shall contribute $50,000 and receive the remaining 96-percent participating percentage. "Participating Percentage" is defined as the interest of each partner in the partnership. Petitioner invested $100,000 as specified in the agreement. The parties did not address whether the corporation invested $50,000 in PTSI, though we have no reason to believe it did not do so.

The agreement provides that petitioner shall receive distributions from PTSI in proportion to his participation percentage. Petitioner also is entitled to a "Preferred Return", which the agreement defines as "an amount equal to 10% annually, cumulative and non-compounded, on each Partner's Adjusted Capital Account". As is relevant here, the term "Adjusted Capital Account" means a partner's contributions to PTSI less any amounts distributed to him. Petitioner reviewed the agreement with his attorney before he signed it.

A partnership "includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not * * * a corporation or a trust or estate." Sec. 761(a). To determine whether a partnership exists, we consider whether, in light of all the facts, the parties in good faith and acting with a business purpose intended to join together in the present conduct of an enterprise. Commissioner v. Culbertson, 337 U.S. 733, 742 (1949); Allum v. Commissioner, T.C. Memo. 2005-177.

The agreement indicates that petitioner and the corporation intended to form a partnership, and that petitioner's $100,000 investment was a contribution of capital in exchange for a partnership interest. Petitioner, however, believes that the agreement created a creditor-debtor relationship and that the

$100,000 was a loan to PTSI. He argues that the preferred return is similar to a loan repayment schedule because it entitles him to receive a return of principal along with a specified rate of interest. Petitioner contends the 4-percent participation percentage he received was collateral for the purported loan.

Where a taxpayer seeks to vary the form in which a transaction is cast pursuant to an arm's-length bargain, we require strong proof that the form of the transaction does not reflect its substance. Miami Purchasing Serv. Corp. v. Commissioner, 76 T.C. 818, 830 (1981); Major v. Commissioner, 76 T.C. 239, 246 (1981); see also Schulz v. Commissioner, 294 F.2d 52 (9th Cir. 1961), affg. 34 T.C. 235 (1960).

Petitioner challenges the form of the transaction based solely on the allegedly debtlike characteristics of the preferred return. In the context of partnership agreements, however, arrangements such as the preferred return are not unusual:

> Many partnership agreements provide partners who contribute capital with some sort of distribution preference. Frequently, the preference is expressed as an annual percentage return on invested capital. In this respect, if in no other, a distribution preference may resemble a form of "interest" on capital. This superficial resemblance is likely to be misleading, however. Distribution preferences rarely have either the economic or the tax attributes of true interest payments to partners. [Whitmire et al., Structuring & Drafting Partnership Agreements: Including LLC Agreements, par. 5.03 (3d ed. 2006).]

See also Jacobson v. Commissioner, 96 T.C. 577, 591 (1991) (describing as "usual and customary" arrangements whereby "the

partner who put up a greater share of the capital than his share of the partnership profits is to receive preferential distributions to equalize capital accounts.") (citing <u>Otey v. Commissioner</u>, 70 T.C. 312, 321 (1978), affd. 634 F.2d 1046 (6th Cir. 1980)), affd. 963 F.2d 218 (8th Cir. 1992).

Petitioner has not provided the strong proof necessary to vary the form in which his transaction with the corporation was cast. See <u>Major v. Commissioner</u>, <u>supra</u>. We therefore hold that petitioner and the corporation formed a partnership.[2]

## Issue 2. Whether Petitioner's Gross Income Includes a Distributive Share of PTSI's Income

For its taxable year 2002, PTSI filed a Form 1065, U.S. Return of Partnership Income, reporting income of $168,957. PTSI prepared a Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., reporting petitioner's distributive share of this income as $8,448. Petitioner did not report that amount on his 2002 Federal income tax return. Respondent determined that

---

[2] Secs. 6221 to 6234 were added by the Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982, Pub. L. 97-248, sec. 402(a) 96 Stat. 648, and provide for the determination of partnership items at the partnership, rather than at the individual partner, level. See <u>Fargo v. Commissioner</u>, T.C. Memo. 2004-13 n.1, affd. 447 F.3d 706 (9th Cir. 2006). In general, the TEFRA provisions do not apply to partnerships having 10 or fewer members unless the partnership otherwise elects. Sec. 6231(a)(1)(B). Because the partnership in question had fewer than 10 members and there is no indication it made such an election, the TEFRA provisions do not apply.

the $8,448 was includable in petitioner's gross income and issued petitioner a notice of deficiency.

A partnership is generally not subject to income tax. Persons carrying on the business as partners are liable for income tax in their separate or individual capacities. Sec. 701. In general, a partner must take into account separately his distributive share, whether or not distributed, of each class or item of partnership income, gain, loss, deduction, or credit. Sec. 1.702-1(a), Income Tax Regs. A partner's distributive share of income, gain, loss, deduction, or credit generally is determined by the partnership agreement. Sec. 704(a).

Petitioner does not dispute the amount of PTSI's income in 2002. Nor does he directly challenge the amount of his distributive share that PTSI reported. Instead, he believes he should not be taxed on the $8,448 because the corporation, as general partner of PTSI, allegedly committed various wrongful acts. Petitioner asserts the corporation refused to provide him with PTSI's financial information, refused to make distributions to him, and embezzled partnership funds.

Although we address the merits of petitioner's allegations infra, we do not do so here. That is because even if petitioner's assertions are true, petitioner must report his distributive share of PTSI's income in 2002. See Burke v. Commissioner, T.C. Memo. 2005-297 (taxpayer's distributive share

of partnership income was taxable to him even though his partner had stolen partnership funds, taxpayer had not received any portion of the stolen funds, and taxpayer and his partner disputed the amount of their respective distributive shares of partnership income), on appeal (1st Cir., May 23, 2006); see also Stoumen v. Commissioner, 208 F.2d 903 (3d Cir. 1953), affg. a Memorandum Opinion of this Court; Gold v. Commissioner, T.C. Memo. 1983-711.  We therefore hold that petitioner must report his distributive share of PTSI's income.

Issue 3.  Whether Petitioner Is Entitled to a Theft Loss Deduction Under Section 165(e)

Petitioner argues that any income he earned from PTSI in 2002 was "offset" by moneys owed to him by the partnership. Petitioner believes the preferred return provided for in the agreement entitled him to receive at least $10,000 per year from PTSI.[3]  Petitioner argues he was not paid those amounts because the corporation embezzled or absconded with partnership funds. We interpret petitioner's argument as a claim for a theft loss deduction under section 165(e).

---

[3] This figure represents the 10-percent preferred return on petitioner's initial $100,000 contribution.  In his pretrial memorandum, however, petitioner asserts that his preferred return has increased to $20,000 per year.  Based on our resolution of the third issue for decision infra, we need not decide whether petitioner's assertion is correct, and we do not address this issue further.

Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Concerning theft losses, section 165(a) is applicable for the year "in which the taxpayer discovers such loss." Sec. 165(e). For purposes of section 165(e), theft includes embezzlement. Sec. 1.165-8(d), Income Tax Regs. If in the year of discovery there is a claim for reimbursement that has a reasonable prospect for recovery, a loss is not considered sustained until the tax year in which it can be ascertained with reasonable certainty. Secs. 1.165-1(d)(3), 1.165-8(a)(2), Income Tax Regs.

Petitioner bears the burden of proving a deductible loss, and he must establish the extent and amount of the loss. Citron v. Commissioner, 97 T.C. 200, 207 (1991). We apply the law of the jurisdiction where the loss was sustained to determine whether a theft or embezzlement has occurred. Bellis v. Commissioner, 540 F.2d 448, 449 (9th Cir. 1976), affg. 61 T.C. 354 (1973); Luman v. Commissioner, 79 T.C. 846, 860 (1982).

It is unclear where petitioner resided in 2002. As a result, it is also unclear where petitioner may have sustained his claimed theft loss. The record indicates that petitioner formerly resided in Illinois and currently resides in California. We set forth each State's theft statute.

Section 16-1 of the Illinois Criminal Code, in pertinent part, defines "theft" as follows:

> Sec. 16-1.  Theft. (a)  A person commits theft when he knowingly:
>
> (1) Obtains or exerts unauthorized control over property of the owner; or
>
> (2) Obtains by deception control over property of the owner; * * *
>
> *     *     *     *     *     *     *
>
> and
> (A) Intends to deprive the owner permanently of the use or benefit of the property; or
>
> (B) Knowingly uses, conceals or abandons the property in such manner as to deprive the owner permanently of such use or benefit; or
>
> (C) Uses, conceals, or abandons the property knowing such use, concealment or abandonment probably will deprive the owner permanently of such use or benefit.  [720 Ill. Comp. Ann. 5/16-1 (LexisNexis 2006).]

In Illinois, the crime of theft includes theft by embezzlement. See People v. McCarty, 445 N.E.2d 298, 301-302 (Ill. 1983) (discussing the Committee Comments to Illinois's Criminal Code); In re Trovato, 145 Bankr. 575, 580 (Bankr. N.D. Ill. 1991).

Section 484(a) of the California Penal Code, in pertinent part, defines "theft" as follows:

> Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent

representation or pretense, defraud any other person of money, labor or real or personal property * * * is guilty of theft. [Cal. Penal Code sec. 484(a) (West 2001).]

In California, the crime of theft also includes theft by embezzlement. People v. Creath, 37 Cal. Rptr. 2d 336, 339 (Ct. App. 1995); People v. Krupnick, 332 P.2d 720, 722 (Cal. Ct. App. 1958).

A. The Corporation's Alleged Refusal To Communicate With Petitioner and Its Alleged Disappearance in 1993

Petitioner contends that from the inception of the partnership, the corporation refused to provide him with PTSI's financial information. He also contends that sometime in or about 1993, PTSI and the corporation "disappeared for over 10 years", during which time he was unable to locate either company.

In August 1999, petitioner attempted to contact PTSI by letter. The agreement lists PTSI's principal place of business as an address in Glenview, Illinois (the Glenview address), "or such other place or places as the General Partner may designate." Petitioner sent a certified letter to the Glenview address, but the letter was returned to petitioner and marked "Unable to forward". The record does not describe the content of the letter. Nor does the record indicate whether petitioner made additional attempts to contact PTSI or the corporation before the notice of deficiency was issued in November 2004.

In July 2005, respondent's Appeals officer sent a letter to the corporation as PTSI's tax matters partner asking for information about petitioner and the partnership (the Appeals officer's letter). The Appeals officer's letter was sent to an address in Grayslake, Illinois (the Grayslake address). Paul Stern, who appears to have been an officer and/or director of the corporation,[4] responded to the Appeals officer in an undated letter (Mr. Stern's letter). Mr. Stern's letter states: (1) PTSI experienced several years of financial difficulty beginning in the mid-1990s; (2) as a result, PTSI was unable to make distributions to petitioner and ultimately ceased operations in 2004;[5] (3) PTSI did not have an updated mailing address for petitioner and had been sending his Forms K-1 to an address in Chicago, Illinois, which was the address PTSI had on file for him; (4) the Forms K-1 that PTSI sent had not been returned as undeliverable; (5) PTSI had changed its principal place of business to the Grayslake address at an unspecified date and remained there until April 2004; and (6) the Grayslake address was no longer used to conduct business. Mr. Stern's letter concludes by listing a contact address in Oak Creek, Wisconsin

---

[4] Mr. Stern signed the agreement on behalf of the corporation.

[5] Neither Mr. Stern's letter nor the remainder of the record indicates what happened to PTSI's assets after the partnership ceased operations.

(the Oak Creek address). Enclosed with the letter were copies of Forms K-1 that PTSI had prepared for petitioner for the taxable years 2000 through 2004.

Petitioner testified that he also sent a letter to Mr. Stern at the Grayslake address in 2005 (petitioner's 2005 letter).[6] The record does not establish precisely when petitioner sent the 2005 letter, although attachments to his pretrial memorandum indicate it was in November 2005. Petitioner claims that his 2005 letter also was returned to him and marked "Unable to forward". Petitioner believes the return of his 1999 and 2005 letters demonstrates that Mr. Stern "refused to accept any correspondence" from petitioner.

We are skeptical of petitioner's contentions regarding PTSI's alleged disappearance. First, PTSI remained an active business in the Chicago metropolitan area[7] until 2004, which petitioner acknowledged at trial. Such ongoing operations are inconsistent with the theory that PTSI was attempting to conceal itself from petitioner. Even if PTSI had been trying to conceal itself, it is difficult to believe that petitioner could not have located PTSI had he made reasonable efforts to do so.

_____

[6] It is not clear why petitioner mailed this letter to the Grayslake address rather than the Oak Creek address listed in Mr. Stern's letter. We assume that petitioner sent his 2005 letter before receiving a copy of Mr. Stern's letter from respondent.

[7] Both Glenview, Ill. and Grayslake, Ill. are located north of Chicago.

Second, although petitioner claims he diligently searched for PTSI after 1993, the only evidence of specific attempts to contact PTSI are the letters petitioner sent in 1999 and 2005. Petitioner did not describe what additional efforts, if any, he made to find PTSI, the corporation, or Mr. Stern. Furthermore, while petitioner emphasizes that his 1999 and 2005 letters were returned to him, it appears that both letters were sent to outdated addresses. Petitioner sent his 1999 letter to the Glenview address listed in the agreement. It is not clear when PTSI stopped using this address; however, the 1999 letter was returned and marked "Unable to forward". Had the letter been marked "Refused", it might have supported petitioner's contention that Mr. Stern was unwilling to accept petitioner's correspondence. As it stands, the returned letter suggests only that PTSI had moved before the 1999 letter was sent and was no longer receiving forwarded mail from the Glenview address.

With respect to petitioner's 2005 letter, Mr. Stern's letter indicates PTSI stopped using the Grayslake address in April 2004. The record does not explain why the Appeals officer's letter was forwarded to the corporation while petitioner's letter was not; however, this seeming anomaly does not establish that the corporation or Mr. Stern was attempting to avoid contact with petitioner.

Finally, as for petitioner's claims that PTSI withheld information, Mr. Stern's letter indicates that PTSI prepared and mailed Forms K-1 to petitioner at the address PTSI had on file for him.  Petitioner did not deny that he changed his mailing address, nor did he contend that he provided PTSI with updated information.  In sum, while petitioner claims that PTSI "disappeared", petitioner appears to have made little effort to stay in contact with the partnership.

B.  PTSI's Alleged Failure To Make Partnership Distributions

Petitioner contends that PTSI did not make distributions to him at any time.  Even if petitioner is correct, the agreement provides that no cash shall be distributed to the partners unless PTSI "has acquired a cash reserve of at least $350,000".  As discussed supra, the agreement called for petitioner to contribute $100,000 and the corporation to contribute $50,000, for a total of $150,000.  There is no indication PTSI accumulated the additional cash necessary to fund the cash reserve and enable the partnership to make distributions.  To the contrary, the financial difficulties mentioned in Mr. Stern's letter indicate that PTSI was, in fact, losing money for most of its existence.  Petitioner introduced no credible evidence to contradict the statements in Mr. Stern's letter.

C.   The Corporation's Alleged Embezzlement of Partnership Funds

Petitioner contends that the corporation embezzled or "laundered" partnership funds.  Petitioner also makes vague allegations of fraud against PTSI, the corporation, Mr. Stern, and other individuals.  As evidence of the alleged wrongdoing, petitioner offers PTSI's Form 1065 for the taxable year 2002, including the Form K-1 prepared for the corporation, which indicates the corporation received a distribution of $185,793 in 2002.  As we understand his argument, petitioner contends that PTSI improperly made distributions to the corporation while refusing to make distributions to petitioner.

The agreement provides that "Available Funds shall be distributed to the Partners pro rata in accordance with their Participating Percentages".  This language indicates that if one partner receives a distribution, the other partners should also receive pro rata distributions.  The parties agree that petitioner did not receive a cash distribution from PTSI in 2002.  Thus, petitioner argues, the corporation violated the agreement and embezzled funds.  We disagree.

More than 10 years elapsed between the formation of the partnership and the distribution to the corporation.  There may be a number of reasons why petitioner did not receive a cash distribution in 2002.  However, we do not speculate as to those reasons.  Petitioner did not introduce the testimony of Paul

Stern or anyone else involved with the corporation or PTSI. Nor did he produce other credible evidence establishing that a theft loss occurred. Accordingly, petitioner has not met his burden of proof and, therefore, is not allowed a deduction under section 165(e).

Issue 4. Whether Respondent Is Estopped From Asserting a Deficiency Against Petitioner

Respondent issued petitioner a notice of deficiency on November 1, 2004. On December 27, 2004, respondent sent petitioner a "closing notice", which states: "we were able to clear up the differences between your records and your payers' records. * * * If you have already received a notice of deficiency, you may disregard it. You won't need to file a petition with the United States Tax Court".

Respondent's change in position raises the issue of equitable estoppel against respondent. "Equitable estoppel is a judicial doctrine that 'precludes a party from denying his own acts or representations which induced another to act to his detriment.'" Hofstetter v. Commissioner, 98 T.C. 695, 700 (1992) (quoting Graff v. Commissioner, 74 T.C. 743, 761 (1980), affd. 673 F.2d 784 (5th Cir. 1982)). To apply equitable estoppel against the Government, however, we must find, inter alia, that the claimant relied on the Government's representations and suffered a detriment because of that reliance. See Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 60 (1995), affd. 140 F.3d 240

(4th Cir. 1998); <u>Estate of Emerson v. Commissioner</u>, 67 T.C. 612, 617-618 (1977). In addition, the Court of Appeals for the Ninth Circuit requires the party seeking to apply the doctrine against the Government to prove affirmative misconduct. <u>Miller v. Commissioner</u>, T.C. Memo. 2001-55.

Respondent has not explained why the closing notice was sent to petitioner. Nevertheless, we cannot apply equitable estoppel against respondent because petitioner timely petitioned the Tax Court. Thus, he did not rely to his detriment on the closing notice. Even if petitioner had relied to his detriment, there is no evidence of affirmative misconduct by respondent. Finally, we note that section 6212(d) provides the Secretary with the authority to rescind a notice of deficiency with the consent of the taxpayer. Where that has not occurred, we have stated that only a closing agreement or decision by the Court binds the parties. <u>Miller v. Commissioner</u>, <u>supra</u>. Respondent did not rescind the notice of deficiency. Because there was no closing agreement or decision of the Court, the parties are not bound by the closing notice.

Petitioner also notes that he received a closing notice for his taxable year 2001. Petitioner appears to argue that the favorable result reflected in the closing notice for that year should also apply to his taxable year 2002. We disagree. Each taxable year stands on its own, and the Commissioner may

challenge in a succeeding year what was overlooked or condoned in previous years.  See, e.g., <u>Rose v. Commissioner</u>, 55 T.C. 28, 31-32 (1970).  The closing notice that petitioner received in 2001 does not affect the outcome of this case.

Respondent's determination is sustained.  In reaching our holding, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

Reviewed and adopted as the report of the Small Tax Case Division.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.